UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:                                                       :
                                                             :    Chapter 11
ABBAS A. SHAH,                                               :    Case No. 07-13833 (SMB)
                                                             :
            Debtor.                                          :
-------------------------------------------------------------X
MCCARTHEY INVESTMENTS LLC,                                   :
2001 JANE F. MCCARTHEY GRAT NO. 5                            :
AND JFM HOLDINGS L.P.                                        :
                                                             :
            Plaintiffs,                                      :
                                                             :
       -- against --                                         :    Adv. Proc. No.: 08-01762
                                                             :
ABBAS A. SHAH,                                               :
                                                             :
            Defendant.                                       :
-------------------------------------------------------------X

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**A P P E A R A N C E S:**

TOBACK BERNSTEIN AND REISS LLP
Attorneys for McCarthey Investments LLC,
  McCarthey Investments LLC, 2001 Jane F.
  McCarthey Grat No. 5 and JFM Holdings L.P.
15 West 44th Street
12th Floor
New York, New York 10036

     Leonard S. Reiss, Esq.
        Of Counsel


LAW OFFICES OF AVRUM J. ROSEN
Attorneys for Abbas A. Shah
38 New Street
Huntington, New York 11743

     Fred S. Kantrow, Esq.
        Of Counsel

PICKARD AND DJINIS LLP
Attorneys for McCarthey Investments LLC,
  McCarthey Investments LLC, 2001 Jane F.
  McCarthey Grat No. 5 and JFM Holdings L.P.
1990 M Street, N.W. - Suite 660
Washington, D.C. 20036

    Paul Bazil, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

    McCarthey Investments, LLC, 2001 Jane F. McCarthey Grat No. 5, and JFM Holdings L.P. (collectively, the "Plaintiffs") filed this adversary proceeding objecting to the chapter 7 discharge of Abbas A. Shah ("Shah" or the "Defendant") pursuant to 11 U.S.C. § 727(c). The Plaintiffs contend that Shah knowingly made false oaths, 11 U.S.C. § 727(a)(4)(A), and knowingly concealed assets within the one year period preceding the petition date. 11 U.S.C. § 727(a)(2)(A). The Court conducted a two-day bench trial, and concludes that the debtor's discharge should be denied.

## BACKGROUND[1]

**A.**     **Shah's Personal Affairs**

    Shah is an educated financial services professional. He studied math at Cambridge University in England, (Joint Pre-Trial Order, dated Sept. 15, 2009, at ¶ 7(e) ("Stipulated Facts")) (ECF Doc. # 14); Tr. (12/7/09) at 17), graduated from Columbia University in New York in 1985 with a Bachelor of Science degree, (PX 3), and attended Columbia Business School for one year. (Stipulated Facts at ¶ 7(e).)

---

[1]     The following conventions are used in citing to the trial record. "Tr. (12/7/09)" refers to the Transcript of the hearing held December 7, 2009 (ECF Doc. # 19) and "Tr. (12/9/09)" refers to the Transcript of the hearing held December 9, 2009 (ECF Doc. # 20). "PX" refers to the Plaintiffs' trial exhibits and "DX" refers to the Defendant's trial exhibits. "DDT" refers to the Defendant's deposition transcript, taken on October 20, 2008, which was received into evidence at the hearing. (Tr. (12/7/09) at 204–05.) Unless otherwise noted, all ECF Doc. #s refer to Adv. Proc. No. 08-1762.

Shah married Jennifer Verger on May 26, 2000, (Tr. (12/9/09) at 256), and they have one minor son born in 2001. (Id.) At the time of the marriage, Verger had approximately $60,000 to $70,000 in savings. (Id. at 259.) After she married Shah, she continued to work selling advertising for the Yellow Pages, but stopped working in December 2000, and has not worked since. (Id. at 256–57.) Shah has been the sole income earner since then. (Tr. (12/7/09) at 23; Tr. (12/9/09) at 257.)

On April 15, 2005, the Shahs opened a joint account (the "Chase Account") at JP MorganChase,[2] (PX 16, at 1), but only Verger's name appeared on the checks. Nevertheless, Shah deposited most, if not all, of his income into the Chase Account, (Stipulated Facts, at ¶ 7(l)), including approximately $477,000 during the twelve months prior to the petition date. (Id. at ¶ 7(m).) Shah closed the joint account on November 23, 2007, less than two weeks prior to the petition date, (id. at ¶ 7(j)), and opened an account at Chase in his own name on December 17, 2007. (PX 15.)

The Chase accounts were not the Shahs' only accounts. Verger maintained bank accounts solely in her name at Washington Mutual, (PX 13), and Bank of America. (PX 14.) Shah provided all of the funds for Verger's bank accounts, (Tr. (12/9/09) at 268–69), and with her consent, Shah signed Verger's name on checks from both accounts. (Stipulated Facts at ¶ 7(n).) Verger also maintained a brokerage account at Charles Schwab, but after 2003, Shah provided all the funds for that account. (Tr. (12/7/09) at 139–40.)

The Shahs jointly purchased Condominium Unit 11A located at 188 East 70th Street, New York, New York (the "Unit") for $1,200,000 on or about February 3, 2003. (Stipulated

---

[2] The record does not reflect whether they maintained a joint account prior to then.

3

Facts at ¶ 7(p).) Verger contributed between $60,000 and $70,000 that she brought to the marriage toward the purchase price. (Tr. (12/9/09) at 259.) The balance of the purchase price was paid with the proceeds of $960,000 mortgage loan provided by Washington Mutual, (PX 7), and funds supplied by Shah. (See Tr. (12/9/09) at 260.) On or about July 1, 2004, Shah transferred his interest in the Unit to Verger for no consideration. (Stipulated Facts at ¶ 7(q).) Shah continues to reside in the Unit, and makes all mortgage payments, real estate taxes, common charges, utilities and property insurance. (Id.)

**B.    Shah's Business Affairs**

Shah began working on Wall Street in 1987. From 1992 to 1996, he headed the U.S. Zero Strips Desks at Lehman Brothers and UBS Securities, (PX 3; Tr. (12/7/09) at 18), where he managed multi-billion dollar books of financial instruments. (Stipulated Facts at ¶ 7(f); PX 3; Tr. (12/7/09) at 18–20.) In 1996, he formed his first hedge fund, Interpacific Capital Corporation. (PX 3.) In 1998, he founded and ran Isospace, Inc. ("Isospace"), a computer software company, (Id.), but in 2001, returned to Wall Street, managing Deutsche Bank's Global Macro Trading Desk. (Id.) In February 2002, he founded and operated his second hedge fund, Linuxor Global Macro Fund, Inc. ("Linuxor") (Id.)

Shah's financial problems appear to have started during this latter period. On July 12, 2002, he received a Notice of Deficiency from New York State, alleging a tax deficiency exceeding $100,000 for the years 1996 through 1998. (DX B; Tr. (12/7/09) at 56.) Shah did not make any payments, and the New York State Commissioner of Finance filed a warrant against Shah in the amount of $220,328.53 on October 5, 2004. (PX 27; Tr. (12/7/09) at 56–57.)

His tax problems were overshadowed by his potential liability to the Plaintiffs. In early

4

2002, the Plaintiffs invested $11.5 million with Linuxor. (Tr. (12/7/09) at 170.) They lost most of their investment, and on July 2, 2004, Shah closed Linuxor, and returned what remained—approximately $4 million—to the Plaintiffs. (Id. at 173.) On August 26, 2005, the Plaintiffs filed an arbitration claim before the National Futures Association ("NFA") against Shah and the two entities that he controlled in connection with the operation of Linuxor. On March 5, 2007, following an evidentiary hearing, the NFA issued arbitration awards in favor of the Plaintiffs and against Shah in the aggregate amount of $9,326,147. (PX 33.) District Judge Denise Cote confirmed the awards on November 1, 2007. (PX 32.) Shah has never paid any portion of the arbitration awards.

Shah had other legal problems connected with the Plaintiffs' investments. In September 2005, the United States Commodities Futures Trading Commission commenced an action against Shah and Linuxor, entitled CFTC v. Abbas A. Shah and Linuxor Asset Management LLP. (PX 30, at 1.) By Consent Order of Permanent Injunction and Other Equitable Relief Against Abbas A. Shah and Linuxor Asset Management LLC, dated Dec. 17, 2008, Shah agreed that he had "cheated and defrauded" the Plaintiffs by sending emails on August 25, 2003 and January 30, 2004, which misrepresented the balance in their accounts and falsely stated that he had recouped their prior, substantial losses. In fact, the Plaintiffs had suffered additional losses. (See PX 30, at 5–6.)

**C.    The Bankruptcy Case**

Shah filed a voluntary chapter 7 petition on December 5, 2007. (Stipulated Facts at ¶ 7(a).) He filed his schedules and statement of financial affairs ("SOFA") (collectively, the "Initial Schedules") (PX 1) on the petition date, and filed amended schedules (the "Amended Schedules," and with the Initial Schedules, the "Schedules") on January 15, 2008. (PX 2.) The

5

Amended Schedules did not make any changes to the SOFA filed on the petition date. Shah made additional corrections and disclosures, in response to the chapter 7 trustee's inquiries, in an Affidavit sworn to on January 27, 2008 (the "January 27 Affidavit"). (PX 79.) The latter listed, inter alia, several loans that Shah had received between 2005 and 2007, but failed to include in the Schedules.

On December 11, 2008, the Plaintiffs commenced this action, objecting to Shah's discharge pursuant to section 727 of the Bankruptcy Code.[3] (Complaint (ECF Doc. # 1).) The Complaint asserted five claims for relief: (i) transfers and concealment of property within one year of the petition date, 11 U.S.C. § 727(a)(2)(A), (ii) transfers and concealment of property after the petition date, 11 U.S.C. § 727(a)(2)(B), (iii) concealment, destruction or failure to keep records relating to Shah's financial condition, 11 U.S.C. § 727(a)(3), (iv) making false oaths or accounts, 11 U.S.C. § 727(a)(4)(A)), and (v) withholding financial information, 11 U.S.C. § 727(a)(4)(D). Shah filed an answer that denied the material allegations in the Complaint. (Answer, dated Jan. 10, 2009 (ECF Doc. # 4).) At trial, the Plaintiffs proceeded under 11 U.S.C. § 727(a)(4)(A) and 11 U.S.C. § 727(a)(2)(A), and I consider the other grounds cited in the Complaint to have been abandoned.

## DISCUSSION

**A.    11 U.S.C. § 727(a)(4)(A)**

Section 727(a)(4)(A) denies a discharge to the debtor who knowingly makes a material, false statement with fraudulent intent. Dubrowsky v. Perlbinder (In re Dubrowsky), 244 B.R. 560, 572 (E.D.N.Y. 2000); Nof v. Gannon (In re Gannon), 173 B.R. 313, 319 (Bankr. S.D.N.Y.

---

[3]    The time for the Plaintiffs to object to the Defendant's discharge was extended by Stipulation and Order of this Court, dated October 16, 2008. (ECF Doc. # 44 in Case No. 07-13833)

1994); Zitwer v. Kelly (In re Kelly), 135 B.R. 459, 461 (Bankr. S.D.N.Y. 1992). The plaintiff must establish by a preponderance of the evidence that the debtor (1) made a statement under oath, (2) the statement was false, (3) the debtor knew the statement was false, (4) the debtor made the statement with fraudulent intent, and (5) the statement related materially to the bankruptcy case. Vidomlanski v. Gabor (In re Gabor), Adv. Proc. No. 06-1916, 2009 WL 3233907, at *7 (Bankr. S.D.N.Y. Oct. 8, 2009); Bank of India v. Sapru (In re Sapru), 127 B.R. 306, 314 (Bankr. E.D.N.Y. 1991). The bankruptcy petition and schedules of a debtor are considered statements under oath, Gabor, 2009 WL 3233907, at *7; Gannon, 173 B.R. at 320, and both omissions and affirmative misstatements can constitute false statements under § 727(a)(4)(A). Gabor, 2009 WL 3233907, at *7; Forrest v. Bressler (In re Bressler), 387 B.R. 446, 460 (Bankr. S.D.N.Y. 2008).

A statement is material if it bears on the discovery of estate property or the debtor's business dealings. Gannon, 173 B.R. at 319–20. Moreover, "otherwise immaterial falsehoods or omissions can aggregate into a critical mass substantial enough to bar a debtor's discharge." Bressler, 387 B.R. at 462; accord Gabor, 2009 WL 3233907, at *7; Sapru, 127 B.R. at 315–16 (Bankr. E.D.N.Y. 1991) ("[E]ven if each falsehood or omission considered separately may be too immaterial to warrant a denial of discharge pursuant to § 727(a)(4)(A) certainly the multitude of discrepancies, falsehoods and omissions taken collectively are of sufficient materiality to bar the Debtor's discharge.")

In determining fraudulent intent, the court can consider, among other factors, the debtor's level of financial sophistication. Rossi v. Moreo (In re Moreo), Adv. Proc. No. 07-8256-478, 2009 WL 2929949, at *8 (Bankr. E.D.N.Y. Sept. 10, 2009). Furthermore, reckless indifference to or disregard of the truth is the equivalent of fraud for the purposes of § 727. In re Chavin, 150

7

F.3d 726, 728 (7th Cir. 1998) (Posner, J.); Salomon v. Kaiser (In re Kaiser), 722 F.2d 1575, 1583 n.4 (2d Cir. 1983); cf. In re Diorio, 407 F.2d 1330, 1331 (2d Cir. 1969) ("Successful administration of the Bankruptcy Act hangs heavily on the veracity of statements made by the bankrupt; . . . reckless indifference to the truth . . . is the equivalent of fraud."). "[T]he cumulative effect of all the falsehoods together evidences a pattern of reckless and cavalier disregard for the truth serious enough to supply the necessary fraudulent intent required by § 727(a)(4)(A)." Kaiser, 722 F.2d at 1583 n.4 (quoting Guardian Industrial Prods., Inc. v. Diodati (In re Diodati), 9 B.R. 804, 808 (Bankr. D. Mass. 1981); accord Gabor, 2009 WL 3233907, at *9 ("Numerous omissions that display a pattern of misleading conduct are sufficient to establish a fraudulent false oath." (quoting In re Bressler, 387 B.R. at 462)).

During the trial, the Plaintiffs attempted to prove numerous misstatements and omissions, some dating back many years. The following discussion recounts those that they did prove that qualify as false statements for the purposes of § 727(a)(4)(A).

    **1.    The Chase Account**

As noted, Shah and his wife maintained the Chase Account as a joint account at JPMorgan Chase Bank, N.A. ("Chase"), (see PX 16), but only her name appeared on the checks. On November 23, 2007—less than two weeks before filing for bankruptcy—Shah closed the Chase Account. (Stipulated Facts at ¶ 7(j).) Item 11 of the Statement of Financial Affairs ("SOFA") requires a debtor to "[l]ist all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold or otherwise transferred within one year immediately preceding the commencement of this case." (PX 1.) Shah answered "None" in response to Item 11 of the SOFA, (id.), and failed to correct the misstatement when he filed Amended Schedules, (see PX 2), or the January 27 Affidavit. (See PX 79.)

8

##### 2.     Payments to Creditors within 90-Day Preference Period

In the 90 days before the petition date, Shah disbursed a number of payments to creditors from the Chase Account, totaling $60,221.46. (See PX 59–67; DX A.) Item 3(b) of the SOFA requires a debtor to "list each payment or other transfer to any creditor made within 90 days immediately preceding the commencement of the case unless the aggregate value of all property that constitutes or is affected by such transfer is less than $5,475." (PX 1.) The Defendant answered "None" in response to item 3(b). (Id.)

##### 3.     Defendant's Gross Income in Year Prior to Filing

In his Initial Schedules, Shah stated that his gross business income for the previous twelve months was $80,000. (PX 1.) These twelve months essentially corresponded to calendar year 2007. However, according to Form 1099 issued by Allied Telesis, Inc. ("Allied Telesis") for the year 2007, Shah earned $120,000 in income that year. (PX 24.) Shah received an additional $44,000 from Isospace during the year preceding bankruptcy that included the notation "1099." (PX 19.)

Shah testified that the payments from Allied Telesis included both compensation and reimbursement of expenses. (Tr. (12/7/09) at 84–85.) He offered no explanation, however, regarding the amount of the reimbursements or why Allied Telesis would include the expense reimbursement payments in a Form 1099.

Shah also testified that the Isospace checks were a return of capital and not income, (Tr. (12/7/09) at 88–89), but his testimony was not believable. Isospace also issued $36,000 in checks to Shah bearing the specific notation "return of capital." (PX 19.) Isospace distinguished between income and return of capital as reflected on the Isospace checks, and Shah did not offer

9

any credible evidence to support the implication that Isospace made incorrect notations on the "1099" checks.

### 4. Nondisclosure of Loans and Security Interest

During 2006, Shah borrowed the aggregate amount of $200,000 from Mr. Takayoshi Oshima. (PX 16, at 135, 147; Tr. (12/7/09) at 105.) In 2007, he borrowed the aggregate amount of $25,000 from Mr. David Luce. (PX 16, at 209, 223; Tr. (12/7/09) at 105–06.) Both loans were undocumented, and were outstanding as of the petition date. Schedule F requires a debtor to list all Creditors Holding Unsecured Non-Priority Claims as of the date of the filing of the Petition. (PX 1.) Shah did not list the Oshima or Luce loans in his Schedules.[4]

He also omitted these loans from the January 27 Affidavit. (PX 79.) He testified at trial that the $120,000 loan from ATTK Holdings identified in the January 27 Affidavit, (PX 79 at ¶ 2), was actually the Oshima loan. (Tr. (12/7/09) at 104.) He could not, however, account for the remaining $80,000. (Id. at 104–05.)

### 5. Nondisclosure of Transfers Outside of the Ordinary Course of Business

During the year preceding the petition date, $158,000 was transferred or disbursed from the joint Chase account either to Verger's Washington Mutual or Bank of America accounts or personally to Verger in cash. In 2006, Shah transferred $243,600 to the Washington Mutual account, (PX 13, 16), and an additional $75,000 to the Schwab account. (PX 16; Tr. (12/7/09) at 140.) Item 10 of the SOFA requires a debtor to "[l]ist all other property other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred

---

[4] At trial, Shah asserted that he did not have to schedule the Luce loan because it was a non-recourse loan secured by his Isospace stock, and the Isospace stock "doesn't exist." (Tr. (12/7/09) at 106–07.) In Schedule B, line 13, he nonetheless listed his 24% stock interest in Isospace, which he valued at $0.00. (PX 1.) Furthermore, he did not list the secured loan on Schedule D.

10

either absolutely or as security within two years immediately preceding the commencement of this case." (PX 1.) None of these transfers were disclosed in the SOFA.

Shah contends that these transfers were made in the ordinary course of business. However, the amount of the transfers, Verger's nominal ownership of the accounts and the use of the transferred funds to pay Shah's personal and business expenses were hardly ordinary.

### 6. Nondisclosure of Information Concerning Defendant's Business

Shah was an officer and the primary principal of two companies—Isospace and Linuxor—within six years of the petition date. (Tr. (12/7/09) at 191–92.) Item 18(a) of the SOFA requires a debtor to disclose, in relevant part, "the names, addresses, taxpayer identification numbers, nature of the businesses, and the beginning and ending date of all businesses in which the Debtor was an officer, director, partner, . . . within six years immediately preceding the commencement of this case." (PX 1.) In response to Item 18(a), Shah answered "None." (PX 1.)

Item 19(a) of the SOFA requires a debtor to "[l]ist all bookkeepers and accountants who within two years immediately preceding the filing of this bankruptcy case kept or supervised the keeping of books of account and records of the debtor." (Id.) The Defendant again answered "None," although he admitted that Marks Paneth & Shron, LLP was in possession of his personal books and records during the period covered by the question. (Tr. (12/7/09) at 193.)

### 7. Nondisclosure of Payments to Family Members

On or about April 17, 2006, Shah borrowed $50,000 from his sister, Naheed Haji a/k/a Naheed Shah. (PX 16, at 134; Tr. (12/7/09) at 177–78.) During 2006, Shah caused Verger to issue two checks aggregating $8,000 to his sister from the Schwab account titled solely in

11

Verger's name.  (PX 10; Tr. (12/7/09) at 181.)  In fact, Shah signed his wife's name on the $3,000 check dated June 9, 2006.  In addition, during the year preceding the petition date, Shah directed Verger to make two payments aggregating $3,000 to his sister from the Chase Account.  (PX 16, 58, 65; Tr. (12/7/09) at 180–81.)  None of these transfers constituted loan repayments.  (See Tr. (12/7/09) at 179.)  Instead, the payments to his sister were intended for the support of their father and another sister.  (Tr. (12/7/09) at 182.)

Item 7 of the SOFA requires a debtor to "[l]ist all gifts or charitable contributions made within one year immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient."  (PX 1.)  The payments made to Shah's sister in 2007 from the joint Chase Account were gifts, and should have been reported in response to item 7.[5]  Instead, Shah answered "None."[6]  In addition, Shah deposited $20,000 in his son's educational account in 2007, twice the amount he deposited in any prior year.  (See PX 22.)  He also failed to disclose this gift.[7]

The foregoing omissions and misstatements were material, bearing directly on Shah's financial affairs and business dealings.  Furthermore, given Shah's education, level of financial sophistication and appreciation of the significance of financial disclosure, the numerous

---

[5] In addition, on August 27, 2007, Verger sent Shah's sister a wedding gift in the sum of $10,500 from her Washington Mutual account.  (PX 13, at 77; Tr. (12/7/09) at 184.)  Verger had not spoken to her sister-in-law since she married Shah (in 2000), and sent the gift at Shah's request from the Washington Mutual account because there were insufficient funds in the Chase Account.  (Tr. (12/7/09) at 184–85.)

[6] As noted above, Shah also transferred substantial amounts to Verger's bank accounts during 2007.  These, too, were arguably gifts that should have been reported in response to item 7 if they did not have to be reported in response to item 10.

[7] The Plaintiffs contend that Shah should have disclosed the educational account on Schedule B, item 11.  Schedule B requires a debtor to list his personal property.  The Plaintiffs failed to demonstrate that Shah had a property interest in his son's educational account.

12

misstatements depict a pattern which supports a finding of recklessness amounting to fraudulent intent. This conclusion is bolstered by the general way in which Shah conducted his financial affairs, essentially parking assets in his wife's name at a time when he knew or should have known that the Plaintiffs might assert substantial monetary claims against him based on his earlier misrepresentations pertaining to their accounts and their lost investments. Indeed, the timing of the Unit transfer leads to no other conclusion. Accordingly, I conclude that the Plaintiffs have sustained their burden of proof under 11 U.S.C. § 727(a)(4)(A).

**B.       Transfer and Concealment of Property**

Under 11 U.S.C. § 727(a)(2)(A), a discharge will be denied if the debtor "(1) with intent to hinder, delay, or defraud a creditor (2) transfers, removes, destroys, mutilates, or conceals, or has permitted to be transferred, removed, destroyed, mutilated, or concealed, (3) property of the debtor (4) within one year of the petition date." Bressler, 387 B.R. at 458; accord Doubet, LLC v. Palermo (In re Palermo), 370 B.R. 599, 612 (Bankr. S.D.N.Y. 2007). "[F]raudulent intent may be established by circumstantial evidence or by inferences drawn from a course of conduct." Baron v. Klutchko (In re Klutchko), 338 B.R. 554, 570 (Bankr. S.D.N.Y. 2005). The badges of fraud that imply intent include "(1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry." Kaiser, 722 F.2d at 1582–83; accord Palermo, 370 B.R. at 612. "The transfer of property by the debtor to his spouse while insolvent, while

13

retaining the use and enjoyment of the property, is a classic badge of fraud." Kaiser, 722 F.2d at 1583.

Concealment refers to placing assets beyond the reach of creditors or withholding pertinent information, and need not involve an actual transfer. Gabor, 2009 WL 3233907, at *8. Although the statute has a one-year look back period, the look back period will be extended where there is a continuing concealment that began more than one year before the petition date but continued into the one-year period. "A typical Continuing Concealment claim involves '(1) the transfer of property by a debtor who still retains a beneficial interest or equitable interest in the property; and (2) the debtor's continuing to treat the property in the same manner after the transfer as before the transfer.'" Palermo, 370 B.R. at 612 (quoting Bank of Chester County v. Cohen, 142 B.R. 720, 726 (Bankr. E.D. Pa.1992)).

Shah and his wife purchased the Unit on February 3, 2003, taking title jointly. On July 1, 2004, approximately ten months after he had told his first lie to the Plaintiffs and only one day before Shah returned the balance of the Plaintiffs' investments, he transferred his interest in the Unit to Verger for no consideration. (Tr. (12/9/09) at 263, 318.) Shah still resides in the Unit and continues to pay the mortgage, common charges, real estate taxes, utilities and property insurance. (Stipulated Facts at ¶ 7(q).)

Verger offered the following explanation at trial. Although she and Shah took ownership of the Unit as tenants by the entirety, they had an understanding that title to the Unit was to be taken in her name alone. (Tr. (12/9/09) at 316.) She testified that she pressured Shah to change the title to reflect as much, and this led to the July 1, 2004 transfer. (Id. at 318.) She further testified that she had no knowledge of Shah's tax debt or potential liability to the Plaintiffs. (Id.)

14

The timing and circumstances of the transfer render Verger's explanation incredible. The transfer of the Unit was rife with numerous badges of fraud: Shah transferred his interest to his wife for no consideration, he retained possession and use of the Unit, and continued to make all the payments required to maintain it, including the mortgage, common charges, utilities, real estate taxes and property insurance. He already faced a substantial tax liability to New York State and the timing of the transfer, after he had lied to the Plaintiffs about their accounts and one day before he returned the balance of their funds, implies an effort to conceal assets before the next shoe dropped. And although the transfer occurred in 2004, the badges of fraud support the application of the continuing concealment doctrine.

The transfer of the Unit is also consistent with Shah's entire pattern of using his wife's name to conceal his assets. Only Verger's name appeared on the Chase Account checks. Verger maintained three accounts in her own name, but Shah provided all the funding.[8] Shah not only funded the Bank of America, Washington Mutual and Schwab accounts, he exercised substantial control over them. His wife disbursed funds per his instructions to pay his business and personal expenses, (PX 11, 12; Tr. (12/7/09) at 148–50), he could not remember a specific instance in which she failed to follow his instructions. (DDT at 177.) He even signed Verger's name on checks written on her accounts. Furthermore, when Shah decided to engage in options trading, he had Verger fill out an application to add that capability to her Schwab account. (See Tr. (12/7/09) at 140–43.) The financial information in the application, particularly the $150,000 of

---

[8] During the trial, the parties stipulated that (a) $741,000 was transferred from the joint Chase Account to the Washington Mutual account between 2004 and the petition date; (b) $499,946.66 was transferred from the Chase Account to the Bank of America account between 2002 to the petition date; and (c) $158,000 was transferred from the Chase Account to the Washington Mutual and Bank of America accounts during the twelve months preceding the bankruptcy filing. (Tr. (12/7/09) at 131–34; PX 13, 14, 16.)

15

annual income, (PX 9, at 2), referred to his income, not hers.[9]

For the reasons stated, I find that the Plaintiffs have sustained their burden of proving that Shah transferred his interest in the Unit to Verger with fraudulent intent to hinder his creditors, and continued to conceal the transfer and his interest up through the petition date. Accordingly, his continuing concealment provides an additional ground to deny Shah his discharge under 11 U.S.C. § 727(a)(2)(A).

## CONCLUSION

The Clerk is directed to enter judgment denying the debtor his discharge. The foregoing constitutes the Court's findings of fact and conclusions of law.

So ordered.

Dated: New York, New York
       May 13, 2010

                                                  /s/ *Stuart M. Bernstein*
                                              STUART M. BERNSTEIN
                                              United States Bankruptcy Judge

---

[9] Shah testified that they used his income on the advice of the Schwab customer representative. (Tr. (12/7/09) at 144–45.) He offered no reason why they just didn't open a joint account with Schwab.